J-S20031-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: B.A.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: B.D., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1887 EDA 2016 |

Appeal from the Order Entered May 19, 2016
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s):  CP-51-AP-0000210-2016

BEFORE:   BOWES, J., OTT, J. and FORD ELLIOTT, P.J.E.

MEMORANDUM BY OTT, J.:                         **FILED APRIL 12, 2017**

B.D. ("Father") appeals from the May 19, 2016 decree in the Court of Common Pleas of Philadelphia County involuntarily terminating his parental rights to his son, B.A.D. ("Child"), born in June of 2011.[1]   Upon careful review, we affirm.

The relevant facts and procedural history are as follows.  Child was placed in the care of the Philadelphia Department of Human Services ("DHS") immediately after birth due to testing positive for controlled substances, *inter alia*.  Trial Court Opinion, 11/23/16, at 1.  The trial court

---

[1] By separate decree on May 19, 2016, the trial court involuntarily terminated the parental rights of P.E.A. ("Mother").  Mother did not file a notice of appeal, and she is not a party to this appeal.

adjudicated Child dependent on June 30, 2011. *Id.* On March 1, 2012, the court placed Child in the physical custody of Father with DHS supervision. *Id.* at 2. On May 31, 2012, the court discharged DHS supervision of Child, and ordered that custody remain with Father. *Id.*

Less than two years later, on February 12, 2014, Father was arrested and charged with crimes related to controlled substances. Involuntary Termination Petition, 3/1/16, at Exhibit A, ¶ ggg.[2] On October 31, 2014, Father pleaded guilty, and he was sentenced to a term of incarceration of 24 to 72 months. Trial Court Opinion, 11/23/16, at 2.

On February 19, 2015, DHS became aware of Father's incarceration based upon a report that also alleged Child was residing without heat or gas service "in an unfinished basement apartment in a deplorable condition with structural damage" with Father's paramour. *Id.* On the same date, the trial court placed Child in the custody of DHS. Involuntary Termination Petition, 3/1/16, at Exhibit A, ¶ kkk. The court adjudicated Child dependent on July 14, 2015. Trial Court Opinion, 11/23/16, at 2.

Father was released from prison on an unspecified date in February of 2016. N.T., 5/19/16, at 14-15, 17, 32. On March 1, 2016, DHS filed a petition for the involuntary termination of Father's parental rights pursuant

_____

[2] During the subject proceedings, Father's counsel stipulated to all but ¶¶ ttt-uuu in Exhibit A attached to the involuntary termination petition. *See* N.T., 5/19/16, at 12-13.

to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). A hearing occurred on May 19, 2016, during which DHS presented the testimony of Alicia Bond, the social worker from the Community Umbrella Association ("CUA") who has worked with this family since Child's placement in February of 2015. Father testified on his own behalf. At the conclusion of the testimonial evidence, the Child Advocate, on the record and in open court, joined DHS in its request for the involuntary termination of Father's parental rights. N.T., 5/19/16, at 36.

By decree dated May 19, 2016, and entered on June 10, 2016, the trial court involuntarily terminated Father's parental rights pursuant to the statutory provisions alleged in the involuntary termination petition. Father timely filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925(a)(2)(i) and (b).

On appeal, Father presents the following issues for our review:

1. Did the [t]rial [c]ourt err in terminating [Father's] parental rights under 23 Pa.C.S. [§] 2511(a)(1), 2511(a)(2), 2511(a)(5), and 2511(a)(8)?

2. Did the [t]rial [c]ourt err in finding that termination of [F]ather's parental rights best served the child's developmental, physical and emotional needs under 23 Pa.C.S. [§] 2511(b)?

3. Did the [t]rial [c]ourt err in changing the child's goal to adoption?

Father's brief at vi.[3]

Our standard of review is as follows:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

---

[3] With respect to Father's third issue, he did not file an appeal from the alleged goal change order. In his notice of appeal, Father stated that he appeals "from the Order entered in this matter on May 19, 2016 terminating the Father's parental rights." Notice of Appeal, 6/17/16. In addition, the caption on Father's notice of appeal includes the docket number for the involuntary termination matter and not the dependency matter. *See* Pa.R.A.P. 902 (providing, "[a]n appeal permitted by law as of right from a lower court to an appellate court shall be taken by filing a notice of appeal with the clerk of the lower court within the time allowed by Rule 903 (time for appeal). . ."). Further, the certified record before this Court includes the termination matter and not the dependency matter. *See* Pa.R.A.P. 1921 (providing, "[t]he original papers and exhibits filed in the lower court, paper copies of legal papers filed with the prothonotary by means of electronic filing, the transcript of proceedings, if any, and a certified copy of the docket entries prepared by the clerk of the lower court shall constitute the record on appeal in all cases"). Therefore, because Father appealed from the involuntary termination decree and not from the goal change order, we do not address his third issue.

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

We need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). In this case, we conclude that the certified record supports the decree pursuant to Section 2511(a)(1) and (b), which provide as follows.[4]

_____

[4] Based on this disposition, we need not review the decree pursuant to Section 2511(a)(2), (5), or (8). *See In re B.L.W.*, *supra*. However, it is important to note that termination pursuant to Section 2511(a)(5) and (8) was not proper because Father was incarcerated at the time of Child's placement in February of 2015. *See In re C.S.*, 761 A.2d 1197 (Pa. Super. 2000) (*en banc*) (stating that Section 2511(a)(5) and (8) did not provide a basis for terminating the father's parental rights when he was incarcerated at the time of the child's removal from the mother's care).

**(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1)  The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

. . .

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A § 2511(a)(1), (b).

With respect to Section 2511(a)(1), this Court has stated, "the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties." *In re Z.S.W.*, 946 A.2d 726, 730 (Pa. Super. 2008) (citing *In re Adoption of R.J.S.*, 901 A.2d 502, 510 (Pa. Super. 2006)).  We have stated, "the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory

- 6 -

provision." *In re N.M.B.*, 856 A.2d 847, 854-855 (Pa. Super. 2004) (citations omitted). Further,

> Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Z.S.W.*, *supra* (quoting *In re Adoption of Charles E.D.M.*, 708 A.2d 88, 92 (Pa. 1998)).

In *In re Adoption of S.P.*, 47 A.3d 817 (Pa. 2012), our Supreme Court discussed *In re Adoption of McCray*, 331 A.2d 652 (Pa. 1975), a case wherein the Court considered the issue of the termination of parental rights of incarcerated persons involving abandonment, which is currently codified at Section 2511(a)(1). The *S.P.* Court stated:

> Applying in *McCray* the provision for termination of parental rights based upon abandonment, now codified as § 2511(a)(1), we noted that a parent "has an affirmative duty to love, protect and support his child and to make an effort to maintain communication and association with that child." *Id.* at 655. We observed that the father's incarceration made his performance of this duty "more difficult." *Id.*

*In re Adoption of S.P.*, 47 A.3d at 828. The *S.P.* Court continued:

> [A] parent's absence and/or failure to support due to incarceration is not conclusive on the issue of abandonment. Nevertheless, we are not willing to completely toll a parent's responsibilities during his or her incarceration. *Rather, we must inquire whether the parent has utilized those resources at his or her command while in prison in continuing a close relationship with the child.* Where the parent does not

- 7 -

exercise reasonable firmness in declining to yield to obstacles, his other rights may be forfeited.

[**McCray**] at 655 (footnotes and internal quotation marks omitted). . . .

**In re Adoption of S.P.**, **supra** (emphasis added); **see also In re B.,N.M.**, 856 A.2d 847, 855 (Pa. Super. 2004) (internal citations omitted) (stating that a parent does not perform his or her parental duties by displaying a "merely passive interest in the development of the child").

With respect to Section 2511(b), this Court has stated that, "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." **In re C.M.S.**, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). Further, the trial court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." **Id**. (citation omitted). Moreover, "[i]n cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." **In re K.Z.S.**, 946 A.2d 753, 762-763 (Pa. Super. 2008) (citation omitted).

Instantly, with respect to Section 2511(a)(1), Father argues that the record was insufficient to support termination of his parental rights. Specifically, Father asserts that Alicia Bond, the CUA worker, testified that he "was released from incarceration in February of 2016, that he was living

with his mother, that he had a visit with the child that went well[,] and that the child had lived with [F]ather from 2012-2014." Father's brief at 4. In addition, Father asserts that he "was incarcerated for the five months before the filing of the termination petition[,] and in the month before the filing of the petition was released from incarceration and beginning to work on his FSP objectives[.] He had, in fact, obtained housing with his mother, . . . and had beg[u]n to visit with the child." *Id.* In short, Father argues that he "should have been given more time to fully complete all his FSP objectives." *Id.* We disagree.

Ms. Bond testified that Family Service Plan ("FSP") objectives were established for Father while he was incarcerated that required him to maintain contact with the CUA and to attend a parenting program while in prison. N.T., 5/19/16, at 27. Ms. Bond testified that letters were mailed to Father in prison communicating his FSP objectives. *Id.* at 27-28. Further, Ms. Bond testified that she spoke with Father by telephone in February of 2016, during which he informed her he would be released from prison, and he provided her with his home address. *Id.* at 14-15. Ms. Bond testified that she informed Father during the phone conversation that, upon his release, he would need to make himself available for case planning, home assessment, and visitation. *Id.* at 15.

In March of 2016, Ms. Bond learned that Father had been released from prison. *Id.* From then until the date of the subject proceedings, Ms.

Bond went to the address Father had provided more than five but less than ten times. *Id.* at 15-16. She testified on direct examination:

> [Q.] And did you, when you went out [to Father's address], do anything to indicate that you had made a visit?
>
> [A.] Yes, I normally leave my business card, along with . . . a general note that we have. It's like a, 'Sorry I missed you,' note, with my contact information on there.

*Id.* at 16. Ms. Bond never gained access to Father's home. *Id.*

Ms. Bond testified that she did not have face-to-face contact with Father until May 9, 2016. *Id.* at 17. At that time, Father told her he had been released from prison since February of 2016. *Id.* She testified as follows on direct examination:

> [Q.] Have you asked [F]ather why he has not made himself more available between his release in February up until May 9th?
>
> [A.] Yes, I have. He explained to me that he had visited . . . Newport News, Virginia. He said that he had a sister who resides in the area[,] and he has spent about a month and a half in Virginia.

*Id.* at 20.

In addition, during their May 9, 2016 meeting, Ms. Bond testified that she explained to Father she needed to assess his home, and she needed to obtain clearances with respect to any person over the age of fourteen residing with him. *Id.* at 17. Father told her that only he and his own mother resided in the home. *Id.* Ms. Bond testified that two of her above-mentioned visits to Father's home occurred on May 10, 2016, when Father did not make himself available for the assessment, and again the day before

the subject proceedings, on May 18, 2016, when Father told her that his mother needed to consent to the home assessment. *Id.* at 18-19. Ms. Bond testified that Father told her his mother "would be available later in the evening, around 6 or 7." *Id.* at 20. Ms. Bond testified that she offered to return that evening or again on the morning of the termination hearing in order to complete the home assessment, but she "didn't get a response from [Father]." *Id.*

Further, on May 9, 2016, Ms. Bond attempted to establish a schedule for visitation between Father and Child. *Id.* at 18. Father had one visit with Child by the time of the termination hearing. *Id.* Father testified that his visit with Child occurred the day before the termination hearing, on May 18, 2016. *Id.* at 33.

Finally, Ms. Bond testified that Father failed to comply with a court order to attend the Clinical Evaluation Unit ("CEU"). *Id.* at 20-21. The record reveals that, by order dated March 17, 2016, the trial court referred Father to the CEU "for a drug screen and an assessment along with 3 random screens prior to the next court listing. . . ." DHS Exhibit 4 at 26 (capitalization omitted). Ms. Bond testified that, during their meeting on May 9, 2016, she told Father about the CEU requirement. N.T., 5/19/16, at 28.

Father's testimony contradicted that of Ms. Bond. Specifically, Father testified that Ms. Bond "could've came [sic] in [to his home]." *Id.* at 31. He

testified that he never received any letters from Ms. Bond while incarcerated. *Id.* at 32. With respect to the requirement to attend the CEU, Father testified as follows:

> [Q.] [D]id you know you were to come down to this court building to what we call our CEU unit? Were you told that?
>
> [A.] Yeah, . . . I got that in the mail.
>
> [Q.] Did you do that?
>
> [A.] No, I didn't come down here, no, because ---
>
> [Q.] Why not?
>
> [A.] ---no, I just knew I had to go to court.

*Id.* at 32.

To the extent the trial court made a credibility determination in favor of Ms. Bond and against Father, we conclude that the record supports it. Further, we conclude that Ms. Bond's testimony demonstrates that Father, in excess of the six months prior to the filing of the termination petition, failed to perform his parental duties as follows.

Father became incarcerated in February of 2014, when Child was two and one-half years old. He was released in February of 2016, approximately one month before the filing of the termination petition, when Child was four and one-half years old. There is no testimonial evidence that Father utilized any resources while in prison to continue a relationship with Child. Ms. Bond testified that, upon his release, Father failed to contact her, despite having been told shortly before leaving prison of his obligation to make himself

available to the CUA and despite Ms. Bonds' multiple visits to the home address he provided. Father subsequently informed Ms. Bond that he spent more than one month in Virginia with his sister after he was released from prison. Approximately three months after his release, and ten days before the termination hearing, Father made himself available for a meeting with Ms. Bond. Father participated in a visit with Child one day before the termination hearing, but he had not allowed Ms. Bond access to his home, and he had not complied with the order to attend the CEU for a drug assessment and screening. Based on this evidence, we conclude that the trial court did not abuse its discretion in terminating Father's parental rights pursuant to Section 2511(a)(1).

With respect to Section 2511(b), Father baldly asserts in his second issue that the court abused its discretion because he "had been visiting with the child . . . and termination of Father's rights could not be in the best interest of this child as it would terminate the love, comfort, security and stability that this child has ever known." Father's brief at 7 (citation to record omitted). We disagree.

The trial court relied on the testimony of Ms. Bond in concluding that involuntarily terminating Father's parental rights "will not cause [Child] to suffer irreparable harm[,] and it is in the best interest of [C]hild based on the testimony regarding the child's safety, protection, mental, physical and

moral welfare, to terminate [F]ather's parental rights."  Trial Court Opinion, 11/23/16, at 5.

In discerning the nature and status of the parent-child bond, this Court has stated that the trial court is not required to rely on expert testimony. Social worker and caseworker testimony is sufficient.  *See In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010) (citations omitted).  In addition, we have explained:

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child. *In re K.K.R.S.*, 958 A.2d 529, 533-536 (Pa. Super. 2008).  The mere existence of an emotional bond does not preclude the termination of parental rights.  *See In re T.D.*, 949 A.2d 910 (Pa. Super. 2008) (trial court's decision to terminate parents' parental rights was affirmed where court balanced strong emotional bond against parents' inability to serve needs of child).  Rather, the orphans' court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship." *In re Adoption of T.B.B.*, 835 A.2d 387, 397 (Pa. Super. 2003).  As we explained in *In re A.S.*, 11 A.3d 473, 483 (Pa. Super. 2010),
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent.  Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011).

Further, our Supreme Court stated, "[c]ommon sense dictates that courts considering termination must also consider whether the children are

in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, *supra* at 268. The Court directed that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id.* at 269. The *T.S.M.* Court observed that, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id.*

Instantly, the record demonstrates that Father visited Child one day before the termination hearing, on May 18, 2016. There is no record evidence that Father saw Child at any other time since his incarceration in February of 2014. Nevertheless, Ms. Bond, the social worker for this family since Child's placement in February of 2015, testified that Child appeared to know Father and to be happy to see him. N.T., 5/19/16, at 28. However, she testified that, based on her observation of the visit, Child would not be harmed beyond repair if Father's parental rights were terminated, and that it would be in his best interest to be freed for adoption. *Id.* at 23-24.

Specifically, Ms. Bond testified that Child is diagnosed with adjustment disorder, and that he attends a therapeutic daycare. *Id.* at 22. She testified that it is "[e]xtremely important" for Child to have permanency. *Id.* at 24. Ms. Bond explained as follows on direct examination:

> [Child] has a difficult time with adjusting. [S]ince being in care,
> he had remained in the same foster home for about 11 months.

In January, that particular foster home was disrupted, due to some allegation from the foster parent.

He went to another home, where he . . . stayed briefly. He had a hard time adjusting from that particular place to the next place. I mean, his behavior in school had changed, which prompted the new evaluation, which was done in February.

From that, he was in another home, and now he's placed --- was just recently placed in April. He seems to be adjusting well in this particular environment.

There are no other children in the environment where he is, and he seems to really benefit from the one[-]to[-]one interaction that he's receiving.

*Id.* at 23.

Ms. Bond further testified on cross-examination by the Child Advocate

that Child's behavior has improved in his current foster home, as follows.

 [Q.] So, in terms of the [foster] home, I know, in the past, there were some issues about his . . . difficulties to handle, and his aggressiveness.

[A.] Mm-hm.

[Q.] Has that calmed down in this new [foster] house?

[A.] It [has], actually. I sat with him for quite some time yesterday, after [he] returned from the visit [with Father]. I knew that that may be a little stressful for [Child], being as though that this is his first time seeing dad.

He seemed to adjust well. Throughout the neighborhood, as we were driving, he was showing me the different activities and things that he goes to. He's attending a church fair in the neighborhood, and he also attends a children's program, which he seems to enjoy.

[Q.] So, you've seen a change in his behavior from his past homes; is that –

[A.] Yes.

[Q.] -- what you'd say?

[A.] Yes.

[Q.] And this looks like an appropriate home and they're willing to adopt?

[A.] Yes, that's correct.

*Id.* at 25-26.

Based on the foregoing, the testimonial evidence does not reveal a parent-child bond between Father and Child. Father was arrested in February of 2014, when Child was two and one-half years old. There is no evidence that Child saw Father again until May 18, 2016, when he was nearly five years old. Although Child appeared to know Father during the supervised visit, there is no evidence that terminating Father's parental rights "would destroy an existing, necessary and beneficial relationship" for Child. *See In re Adoption of T.B.B.*, *supra*; *see also In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008) (stating, in part, "Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists").

Further, after Father's arrest, Child lived for one year with Father's paramour until February of 2015, when DHS removed him from a basement apartment that was in deplorable condition. Thereafter, Child resided in a foster home for eleven months. Child was having behavioral problems, and,

to the best we can discern, he was in one more foster home from January of 2016 until before being placed in his current foster home in April of 2016, approximately one month before the subject proceedings. Ms. Bond testified that, although diagnosed with adjustment disorder, Child has adjusted well to his new foster placement, a pre-adoptive resource, and his behavior has already improved.

Ms. Bond testified that it is "extremely important" for Child to have permanency. Because we have concluded that Father's conduct warranted termination under Section 2511(a)(1) since, in part, he had not complied with the order to attend the CEU or to allow Ms. Bond into his home for an assessment, it was unknown whether Father continued his illegal use of controlled substances and/or if he had an appropriate home for Child. As such, at the time of the subject proceedings, Child was in placement for fifteen months, and reunification with Father was not imminent. Upon careful review, we conclude that the testimonial evidence supports the trial court's decision that terminating Father's parental rights pursuant to Section 2511(b) will serve the developmental, physical, and emotional needs and welfare of Child. *See In re B., N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004) (stating that, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her

potential in a permanent, healthy, safe environment"). Accordingly, we affirm the decree.

Decree affirmed.
Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/12/2017